## SAMUEL EVANS *v.* THE STATE.

1. JURY. — Though, as a general rule, it is too late, after the jury is empanelled and sworn, to inquire into the impartiality of a juror, yet if, after a juror has been sworn, he is found incompetent to serve, he may, in the exercise of a sound discretion, be excused by the court at any time before evidence is given; and this rule extends to capital cases, and as well for cause existing before as after the juror was sworn.

2. SAME — CASE STATED. — After the juror was empanelled and sworn, but before any evidence was introduced, the defendant informed the court that he had just learned that a certain juror had formed and expressed an opinion in the case, and had said he intended to hang the defendant; wherefore defendant moved that said juror be withdrawn, which, with consent of counsel for the prosecution, was done.  Thereupon the defendant moved to be discharged, in consequence of such action. *Held*, that the court below properly overruled the motion, and, after empanelling another juror, properly put the defendant on his trial.

3. MURDER.— The distinguishing characteristic of murder is, that the homicide was committed with malice aforethought, express or implied.

4. MALICE, in its legal import, has a much more comprehensive meaning than its popular sense of hatred or hostility. A homicide on express malice is when one person kills another with a sedate and deliberate mind and formed design, and without circumstances of extenuation, excuse, or justification. If the sedate, deliberate mind, and formed design be not proved, and circumstances of extenuation, excuse, or justification do not appear, the homicide is on implied malice, and is murder in the second degree. Note in the opinion a charge *held* to be a correct enunciation of the law of murder, manslaughter, and justifiable homicide in self-defence.

5. FACT CASE.— Note evidence which, though somewhat conflicting, suffices to sustain a conviction for murder in the second degree.

6. NEW TRIAL — NEWLY DISCOVERED EVIDENCE.— In order to warrant the granting of a new trial, the applicant must satisfy the court that the newly discovered evidence relates to independent facts discovered since the trial; that there was no want of diligence on his part in the first instance; and, when it is possible to be obtained, the affidavit of the witness to the new facts proposed to be proved must accompany the affidavit of the applicant.

APPEAL from the District Court of Lamar. Tried below before the Hon. R. R. GAINES.

The opinion discloses the case, and details the substance of the evidence. The indictment was for the murder of Frank Crain, who was a brother-in-law of Evans, the defendant.

*Harrison & Ownby*, for the appellant. The court should have granted the defendant a new trial. *Jordan* v. *The State*, 10 Texas, 502; *Von Harter* v. *Courtade*, 35 Texas, 434; *Simonton* v. *Forrester*, 32 Texas, 584. The court should charge the law correctly, whether asked or not. *Maria* v. *The State*, 28 Texas, 698. The court improperly instructed the jury that a *deadly weapon* is one which, as used in the particular case, is likely to produce death. The proper definition would have been *any instrument* which, as used in the particular case, is likely to produce *death* or *serious bodily harm*. *McReynolds* v. *The State*, 4 Texas Ct. App. 327; *Skidmore* v. *The State*, 43 Texas, 94;

*Kouns* v. *The State*, 3 Texas Ct. App. 13. With due regard to the facts in the case, the court did not sufficiently charge on murder in the second degree. *Villareal* v. *The State*, 26 Texas, 107 ; *Atkinson* v. *The State*, 20 Texas, 522 ; *Hudson* v. *The State*, 40 Texas, 15 ; Code Cr. Proc., art. 594 (Pasc. Dig., art. 3059). *Reasonable doubt* should be charged, not alone upon the whole case, but between the different degrees of the offence. See subject discussed in *Murry* v. *The State*, 1 Texas Ct. App. 417 ; *Blake* v. *The State*, 3 Texas Ct. App. 581 ; *Guargando* v. *The State*, 41 Texas, 634 ; *Monroe* v. *The State*, 23 Texas, 210 ; *Villareal* v. *The State*, 26 Texas, 107. On the charge as to self-defence, apply *Cheek* v. *The State*, 4 Texas Ct. App. 445 ; *West* v. *The State*, 2 Texas Ct. App. 460 ; *Blake* v. *The State*, 3 Texas Ct. App. 588 ; *Irwin* v. *The State*, 43 Texas, 236. *Maria* v. *The State*, 28 Texas, 710, lays down the true test by which homicide may be reduced from murder to manslaughter. See also 4 Bla. Comm. 200 ; *McCoy* v. *The State*, 25 Texas, 39 ; *Atkinson* v. *The State*, 20 Texas, 531. When the jury is organized and empanelled, jeopardy attaches to the accused, and he cannot be twice jeopardized. 1 Bishop's Cr. Proc., sect. 1014 ; 3 Greenl. on Ev., sect. 37 ; Cooley's Const. Lim., sect. 327. On new trial, see 1 Texas Ct. App. 627 ; 3 Texas Ct. App. 59, 501 ; 2 Texas Ct. App. 209, 456, 4 Texas Ct. App. 249.

*Thomas Ball*, Assistant Attorney-General, for the State.

ECTOR, P. J. This was a prosecution, in the District Court of Lamar County, against Samuel Evans, for murder. A verdict of guilty of murder in the second degree was rendered by the jury against the prisoner, and his punishment was assessed at confinement in the penitentiary for twenty-five years, and a judgment entered accordingly. To reverse this judgment the case is brought here by appeal, and various errors have been assigned, the most important of which have been fully considered.

At the March term, 1879, of said court the case was called for trial, the State being represented by the county attorney, and the defendant being in court in person, and represented by counsel; and both parties announced ready for trial. After this announcement, and after the defendant had been duly arraigned and had pleaded not guilty, they proceeded to organize a jury. After the jury had been duly selected, empanelled and sworn, the defendant, by his counsel, then made known to the court that he had been informed since the empanelling of the jury that Heck Huddle, one of the jurors, had formed and expressed an opinion of the case unfavorable to defendant, and had said that he intended to hang the defendant, and moved the court that said juror be withdrawn and another selected in his place; and, the county attorney having consented thereto, said juror was withdrawn at the instance of defendant, as aforesaid; and another juror was then selected, and the jury were again duly sworn. Thereupon the defendant, under a special plea, then moved "the court to discharge him from the custody of the court, in this : that on this day this case was called for trial, and the jury were empanelled and sworn, and that, after said empanelling of the jury, the court excused Heck Huddle, one of the said jurors." The court overruled the special plea of the defendant, to which the defendant saved a bill of exceptions.

As a general rule, it is too late, after the jury has been empanelled and sworn, to inquire into the impartiality of a juror. But, Mr. Wharton says, after a juror has been sworn in chief, and taken his seat, if it be discovered that he is incompetent to serve, he may, in the exercise of a sound discretion, be set aside by the court at any time before evidence is given; and this may be done even in a capital case, as well for cause existing before as after the juror was sworn. The great purpose of the right to challenge a jury for actual bias is to secure to the defendant and the State a fair and impartial jury. It not only appears

that the defendant consented to the discharge of the juror Huddle, but that it was done at his instance. The principle of justice applies here, as in other cases, that no man can complain of a thing to which he has given his consent. The doctrine of waiving constitutional rights does not rest, as a matter of reason, merely on the consideration that a man may relinquish what has been given him for his benefit; it rests equally, also, on the necessity of conducting causes in a way to secure justice to defendants. If they never could waive any thing, says Mr. Bishop, "the law, on the other hand, must pursue them with exact aim, since it could make no arrangement to vary its course." 1 Bishop's Cr. Law., sect. 848. This does not conflict with the rulings of our Supreme Court in the case of *Horbach* v. *The State*, 43 Texas, 242, where the court say: "No law, or established practice under the law, is known which sanctions the *peremptory* challenge of a juror, by either party in such case, after the juror is accepted and empanelled, whether the jury be full or not, though there may be discretion in the court for excusing or setting aside a juror after he is thus selected, for good cause shown at the time why he cannot or ought not to serve on the jury." Nor does it conflict with the rulings of this court in the case of *Baker* v. *The State*, 3 Texas Ct. App. 525.

The second, third, fourth, fifth, and sixth errors assigned refer to the charge of the court. It is the duty of the court to charge law applicable to the case in point. We believe that no injustice was done by the court in this respect, and that the charge of the court was a fair, clear, and correct enunciation on murder in the first and murder in the second degrees, manslaughter, and justifiable homicide in self-defence. We believe that the charge of the court is not liable to the objection urged against it, and that no abstract deductions were necessary to be made by the jury in order to find the elements of murder in the second degree. The court, after telling the jury what murder is, proceeds in his

charge as follows : " When the malice is express, it is murder in the first degree ; but when it is merely implied, it is murder in the second degree.   Malice, in its legal sense, means the intentional doing of a wrongful act, without legal justification or excuse.   Hence, when a homicide occurs, and the circumstances are absent which would excuse or justify the act, or reduce it to manslaughter, the law implies malice.   Express malice is when one, with a sedate, deliberate mind, and formed design, kills another ; which formed design is evidenced by external circumstances discovering that inward intention, such as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some great bodily harm.

" I shall explain to you under what circumstances a homicide is excused or justified in law, and also when a homicide is reduced from murder to manslaughter.   Manslaughter is voluntary homicide, committed under the immediate influence of sudden passion, arising from an adequate cause, but neither excused nor justified by law."   The court further instructs the jury in regard to manslaughter, substantially in the language of the statute, in arts. 2251–2253, and in the first and second paragraphs of art. 2254, Paschal's Digest.

The court charged the jury, under the head of self-defence, as follows : " Homicide is excusable, and is subject to no punishment, when committed in necessary self-defence ; but the attack upon the person of an individual, in order to justify homicide, must be unlawful, and also must be such as produces in the mind of the slayer a reasonable expectation or fear of death, or of some serious bodily injury.   The party whose person is so unlawfully attacked is not bound to retreat, in order to avoid the necessity of killing his assailant ; but, on the other hand, when two persons enter willingly into a conflict with deadly weapons, neither can claim the benefit of the law of self-defence.   So, a party who seeks a difficulty with a deadly weapon, and makes the first aggression, cannot justify under the law of self-defence.

" I therefore charge you, gentlemen of the jury, that if you believe, from the evidence which has been adduced before you, beyond a reasonable doubt, that defendant stabbed or cut Frank Crain with a knife, and thereby took his life; and if you further believe that the act was neither committed under the immediate influence of sudden passion, arising from cause adequate to reduce the killing to manslaughter, nor in necessary self-defence (as I have explained, and shall more fully explain hereafter), you will find the defendant guilty of murder; and if you further so believe that the killing was the result of a design formed on part of defendant, when his mind was calm and deliberate, and capable of cool reflection, you will find him guilty of murder in the first degree; but if you do not so believe the killing was the result of such formed design, you will find him guilty of murder in the second degree.

" If defendant is not guilty of murder, and if defendant stabbed or cut Frank Crain, and thereby killed him, and the act was committed under the immediate influence of such a degree of anger or sudden resentment as is calculated to render a man of ordinary temper incapable of cool reflection, and this passion sprung directly from some assault and battery made upon him by Crain, which inflicted upon him pain or bloodshed; or, if the passion sprung from a serious personal conflict, in which great injury was inflicted upon him by Crain, by means of a stick, although defendant may have been the aggressor, provided such aggression was not made by defendant with intent to bring on the conflict, and for the purpose of killing, defendant is guilty of manslaughter, unless his act was committed in necessary self-defence, as I shall now explain.

" If defendant did not willingly enter into the fight with a deadly weapon, and if, before he began the assault (if any) upon Crain, Crain attacked him with a stick, in such a manner that it produced in defendant's mind a reasonable expectation or fear of death, or of some serious bodily injury,

defendant is entitled to be acquitted. In this connection, I instruct you that a deadly weapon is a weapon which, as used in the particular case, is an instrument likely to produce death. So, if defendant's life had been threatened by Crain, and these threats had been communicated to defendant, and at the time defendant stabbed Crain, Crain was doing an act from which defendant reasonably inferred that Crain was in the act of executing the threats so made, defendant is not guilty. But defendant cannot justify on this ground if he sought the difficulty with Crain, or willingly entered into a conflict with Crain, with a deadly weapon, or committed the first aggression himself.''

The court gave the defendant the benefit of a charge on the law of reasonable doubt, and the presumption of innocence, and also instructed the jury to give him the benefit of any reasonable doubt as to the degrees of his offence. We have copied so extensively from the charge of the court as, perhaps, the shortest way to show that it is not liable to the complaints made against it. The definition of malice in the charge of the court is substantially the same as that given by Mr. Bouvier in his Law Dictionary. He says malice (in criminal law) is '' the doing a wrongful act intentionally, without just cause or excuse.'' 2 Bouv. L. Dic. 91. The distinguishing characteristic of murder is homicide with malice aforethought, expressed or implied. Malice, although in its popular sense it means hatred, ill-will, or hostility to another, yet in its legal sense has a very different meaning, and characterizes all acts done with an evil disposition, a wrong and unlawful motive or purpose, the wilful doing of an injurious act, without lawful excuse. Express malice is when one person kills another, with a sedate and deliberate mind and formed design. Where a person kills another suddenly, without any considerable provocation, the law imputes malice to the unlawful act. When the fact of killing is proved by satisfactory evidence, and there are no circumstances disclosed tending to show

justification or excuse, and it is not proved that the accused killed the deceased with a sedate, deliberate mind, and formed design, this would be a homicide committed with malice aforethought implied. The charge of the court was an admirable one to enable the jury to understand under what state of facts proved they would find the defendant guilty of murder in the second degree. It is by no means an easy matter to draw the distinction between express and implied malice intelligibly to jurors, and we frequently hear the remark made, by men learned in the law, that distinctions between these legal terms are too metaphysical.

There was some conflict in the evidence. It appears from the statement of facts that the deceased and the defendant were brothers-in-law. The deceased, on his way home with his sister, Mrs. Martha James, stopped at the house of Mr. Goodall to get a drink of water. The defendant was there at the time, in the yard. The defendant, the deceased, and his sister left Goodall's together. The defendant was riding; deceased and his sister were walking. They joined in friendly conversation until they had gone about two hundred yards, when deceased asked defendant if he " was going to pay that debt at Bray's." Deceased told him that he ought to pay it, or he had to pay it. Evans gave the deceased the lie, and got off his horse, with his hand in his pocket. Defendant and deceased cursed each other. Mrs. James got the deceased to leave the defendant. Defendant got on his horse, and followed on, cursing the deceased. When they got in front of the gate where deceased lived, defendant got off his horse, with his hands in his pockets. Here there is some conflict in the evidence. Mrs. James, one of the witnesses, who was not far from the parties, says when the defendant got off of his horse the deceased was five or six steps from the road, and the defendant in the road; that the fight took place in the road, and that deceased stooped down and picked up a stick. She told her brother not to fight the defendant, as he would not fight

him a fair fight. The stick was larger than an ordinary walking-stick, and about eighteen inches long. When she saw her brother start towards the defendant, she turned and walked towards the house. When she looked around again, she saw her brother coming towards the house, and the blood running down his side and legs. Defendant was angry and excited when the killing was done.

Nancy Crain, also a sister of the deceased, testifies that she saw the difficulty between her brother (the deceased) and the defendant. She says: "The first I heard of it I was in the house, and heard some one coming up the road, cursing, and I thought it was a drunken man, and shut the door. I recognized Sam Evans's voice, and ran out. Before I got to the fence I saw Sam Evans get off his horse. Before I got to the fence I saw Sam Evans stab Frank. He stabbed Frank more than once. Deceased did not attempt to strike defendant. Defendant got off his horse and advanced on Frank. * * * Deceased did not have any stick. * * * I did not see any knife in defendant's hand. I just saw him strike."

Frank Crain lived but a short time after he was cut. Dr. Thompson, a physician in the neighborhood, was called to see the deceased, who died before the doctor arrived. There were four wounds on the deceased's left breast and shoulder, which appeared to have been made with a knife. The wound which Dr. Thompson thought was fatal, was one and one-half inches below, and one inch to the left of, the left nipple.

The defendant introduced the witness Turpin, who testified that he heard the deceased threaten to take the life of defendant on Sunday night before the killing, in regard to a debt; that deceased said to witness he was going to ask the defendant to pay the debt, and if he did not pay it he was going to kill him; that he communicated these threats to defendant the next morning, and defendant said he did not believe that Frank Crain would hurt him. There was

evidence introduced by the defence going to show that, after the killing, the defendant had some bruises upon him, which he said were made by Crain. Upon this point there was some conflict in the evidence. After a careful review of the whole record, we believe that the verdict of the jury and the judgment of the court are fully warranted by the evidence. Applying the law to the facts in this case, the jury were fully warranted in believing that the threats made by the deceased did not afford a justification for the killing of Crain; for, at the time of the homicide, the deceased did no act from which the accused might reasonably infer an intention on the part of the deceased to carry the threats into execution.

And they were also justified in finding, from the evidence, that the killing was malicious,— the result of a depravity of heart, and of a cruel and wicked disposition; that the homicide committed was not manslaughter, for the killing was not committed under the immediate influence of sudden passion, arising from an adequate cause. The indulgence which the law shows in cases of manslaughter is to the weakness of human nature, not its wickedness. It looks upon men as they are: the creatures of natural impulses, and, when justly provoked and transported by passion, ungovernable, and deaf to the voice of reason. And, as Sir William Russell says in his work on Crimes, " the provocation which is allowed to extenuate in the case of homicide must be some thing which a man is conscious of, which he feels and resents, at the instant the fact which he would extenuate is committed." 1 Russ. on Cr. 514. The evidence, taken as a whole, we think, shows that the fatal act done by the accused cannot be imputed to human infirmity, and was not in necessary self-defence, but was the result of a malignant heart.

It only remains for us to notice the action of the court in refusing defendant's motion for new trial, on the ground of newly discovered evidence of John Hill, to prove that the

deceased was a quarrelsome, overbearing, contentious, reckless, desperate, and dangerous man.   Motions for new trial on the ground of newly discoved evidence are governed by well-defined rules.   Newly discovered evidence is some independent fact, or facts, which a defendant has learned since the trial, and the applicant must satisfy the court that it came to his knowledge after the trial; that there was no want of diligence on his part; and, when it is possible to obtain it, the affidavit of the witness to the new facts proposed to be proved by him must accompany the affidavit. It is incredible to suppose that the general character of the deceased for peace or violence, in the community where they both lived, was not as well known to the defendant before as after the trial, and the witness or witnesses by whom he could establish it, he being his brother-in-law.   The fact that the accused had been confined in jail is no sufficient excuse on his part for failing to ascertain sooner the facts he could prove by the witness Hill.   His counsel resided in the county, and could have availed themselves of the means provided by law to secure the attendance of all witnesses desired at the trial.

We deem it unnecessary to discuss the minor points presented in the record.   Upon the fullest consideration we have been able to give it, we are unanimously of the opinion that the judgment of the District Court in this case should not be disturbed.   It is, therefore, affirmed.

*Affirmed.*